**NOT RECOMMENDED FOR FULL TEXT PUBLICATION**
File Name: 07a0751n.06
Filed: October 23, 2007
No. 06-3877

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

VERA GJOLAJ, ET AL.,
    *Petitioner*

                                     On Petition for Review of a Decision of the
                                     Board of Immigration Appeals

        v.

PETER D. KEISLER,*ALBERTO R. GONZALES,
ATTORNEY GENERAL OF THE UNITED STATES,
    *Respondent*

_____/

**BEFORE: BOGGS, Chief Circuit Judge, KENNEDY, Circuit Judge, and JORDAN, District Judge.**[**]

**KENNEDY, Circuit Judge.** Petitioners Vera and Luk Gjolaj and family ("the Gjolajs") seek review of a final order of removal issued by the Board of Immigration Appeals ("BIA"), adopting and affirming the Immigration Judge's ("IJ") denial of their applications for asylum, withholding of removal, and request for voluntary departure. The IJ found the Gjolajs' testimony was incredible and they had not carried their burden of proof. Because the IJ's denial is supported by substantial evidence in the record, we **AFFIRM** the BIA's decision and **DENY** the petition for review.

**BACKGROUND**

---

[*]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Acting Attorney General Peter D. Keisler is automatically substituted for former Attorney General Alberto R. Gonzales.

[**]The Honorable R. Leon Jordan, Senior United States District Judge for the Eastern District of Tennessee, sitting by designation.

The Gjolajs, natives and citizens of Albania, entered the United States without inspection at Dallas, Texas, on or about January 4, 2001. On December 20, 2001, Petitioner Vera Gjolaj administratively filed for asylum.[1] The application was referred to an IJ in Detroit, Michigan, and the Gjolajs were served with Notices to Appear. The Gjolajs conceded removability.

In her initial asylum application, Vera Gjolaj stated that she and her family had suffered persecution at the hands of the communist, and later socialist, Albanian government for their membership and activity in the Democratic Party. Vera stated that in 1990 and 1991, she and her husband, Luk, had participated in several anti-communist demonstrations in which they were beaten by police along with other demonstrators. According to her statement, Vera continued her political involvement with the Democratic Party and participated in demonstrations from 1997 to 2000 protesting the socialist government. She also served as an election observer for her party and reported that she was threatened and physically removed from the poll center for reporting suspicious or fraudulent ballots to the election officials. During this time, Vera stated that she received many threats, warning her to stop her political activity.

On October 2, 2000, as she was walking home from a party organized to celebrate the victory of a newly elected Democratic candidate, Vera claimed that masked men pulled her into a car, removed their masks, revealed that they were policemen, and took her to the station. Vera stated that she was placed in a separate room and questioned about her political activity. Vera claimed that the police officer then touched her in a sexual manner. When she protested, he left the room. According to Vera, later that night as she was sleeping the officer entered the room and raped her

---

[1]Vera Gjolaj was the only petitioner to apply for asylum and withholding of removal. The remaining petitioners' claims are dependent on her claim.

at gunpoint, telling her (apparently sarcastically) that they were celebrating the victory of her party. The officer released her the next morning and told her not to speak of the incident under threat of harm to herself and her family.

Vera's initial asylum application was amended several times. On January 21, 2003, Vera filed the first amendment to her asylum application. Vera submitted a second amendment on September 15, 2004. At a hearing on September 30, 2004, Vera stated that she did not know what was in her 2003 amendment and requested to withdraw her 2004 amendment. She stated that she wished to change the application to reflect that her daughters had both been kidnapped. The court continued the case and Vera submitted yet another amended asylum application on November 4, 2004. Finally, at a merits hearing on November 24, 2004, at the prompting of her attorney, Vera orally amended her November 4, 2004 application to include two additional incidents. The claims in each application and the corroborative documents are essentially the same.

At the merits hearing, both Vera and Luc Gjolaj testified about the political persecution they allegedly suffered in Albania. In support of their claims, the Gjolajs offered the amended asylum applications, a supplemental written statement, membership cards in the Democratic Party and the Association of Former Politically Persecuted People, and other documents.

After the presentation of the evidence, the IJ rendered an oral decision, denying all relief because he found the Gjolajs were incredible and had not met their burden of proof. Specifically, the IJ found that Vera's testimony was "vague, it was inconsistent with her application, and it was internally inconsistent," and that Luc's testimony "was also internally inconsistent, it was vague, and it did not truly corroborate his wife's story on the basic elements of the claim, particularly . . . her rape in October of 2000." Furthermore, the IJ found that the proffered corroborative documents

3

"raise on the face of the document more questions about the verity of the two adult respondents than they can possibly resolve in their favor." According to the IJ, if anything, the documents "tend to torpedo the wife's claim." Based on the Gjolajs' adverse credibility determination and lack of corroborating documents, the IJ found that they had "failed miserably" to establish eligibility for asylum or withholding of removal. The IJ also denied the Gjolajs' request for voluntary departure as they could not demonstrate by clear and convincing evidence that they had the means and intent to depart the United States. The IJ ordered the Gjolajs' removal to Albania.

The Gjolajs timely appealed the IJ's decision on December 10, 2004. On June 2, 2006, the BIA adopted and affirmed the IJ's decision without opinion. The Gjolajs now appeal.

## ANALYSIS

Where, as here, the BIA summarily affirms the IJ without opinion, we review the IJ's decision directly to determine whether the BIA's decision should be upheld on appeal. *Denko v. INS*, 351 F.3d 717, 726 (6th Cir. 2003); 8 C.F.R. 1003.1(e)(4). We must sustain the IJ's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). To overturn a factual determination under this highly deferential standard, "we must find that the evidence not only *supports* [a contrary] conclusion, but *compels* it." *Id.* at 481 n. 1.

### I. Request for Asylum

The Gjolajs petition for review of the IJ's adverse credibility determination and finding that they failed to establish eligibility for asylum. To qualify for asylum, an applicant must first establish her status as a refugee by demonstrating that she is "unable or unwilling" to return to her native country because of "persecution or a well-founded fear of persecution on account of . . . race,

4

religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A), § 1158(b)(1). If credible, the testimony of the applicant may be sufficient to sustain her burden of proof without corroboration. 8 C.F.R. § 1208.13(a). However, if the applicant's testimony "could be viewed as incredible, inconsistent, or incoherent, a fact-finder may reasonably conclude, absent corroboration, that the testimony is insufficient to meet the standard of proof required." *Sako v. Gonzales*, 434 F.3d 857. 862 (6th Cir. 2006). Even if the applicant establishes refugee status, the IJ may still deny asylum in his discretion. 8 C.F.R. § 208.14(a).

Credibility determinations, crucial to determining whether an applicant has sustained her burden of establishing refugee status, are findings of fact reviewed under the substantial evidence standard. *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). Under this highly deferential standard, findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. 1252(b)(4)(B); *Hassan v. Gonzales*, 403 F.3d 429, 434 (6th Cir. 2005). Therefore, we must determine whether "any reasonable adjudicator" would be compelled to find the Gjolajs' testimony credible.

The IJ had ample evidence on which to base his adverse credibility determination and denial of asylum. Considering the totality of the circumstances and all relevant factors, the IJ found that the Gjolajs' testimony was vague, ambiguous, and riddled with inconsistencies. In his decision, the IJ noted several discrepancies between Vera's testimony and her written asylum application. In her application, Vera stated that she had participated in several anti-communist demonstrations in 1990 and was beaten along with other demonstrators. She also claimed in her statement that she had received numerous oral and written threats. During her removal proceedings, however, Vera failed to mention any of these beatings or threats that went to the heart of her political persecution claim.

5

The IJ also noted that Vera failed to provide any details concerning particularly when, where, or how she was beaten. Furthermore, the IJ noted contradictions between Vera's testimony and written application regarding her alleged rape. Vera stated in her application that prior to the rape the police officer had questioned her about her political activities and touched her in a sexual manner. After she protested, he left the room. According to her application, he returned hours later to rape her. On direct examination, however, Vera merely testified that the officer had questioned her hours prior to the rape. She did not mention any inappropriate sexual contact at all. When asked on cross-examination whether she had been touched sexually before the rape, Vera stated that she had not. The government counsel confronted Vera with her contradictory testimony and she responded, "I couldn't tell everything that happened." Based on her vague and inconsistent testimony, the IJ found her "completely unbelievable." Because the IJ is in the best position to determine credibility based on the demeanor of the witness and presentation of testimony, we will not overrule that determination lightly.

The IJ also found that the documents proffered by the Gjolajs in support of their claims were suspicious. First, the Gjolajs' Democratic Party membership cards were curiously missing the portion of the card where notations would be made for payment of membership dues and donations. When questioned, Vera did not know why their cards did not have this information. Second, the Gjolajs submitted two alleged statements from Democratic Party leader Fred Sterkaj, reflecting their political activity with the party. These statements were suspicious on their face as Sterkaj's name was spelled differently on each and they appeared to have been signed by different people. Third, the Gjolajs appended membership cards for the Association of Former Politically Persecuted People. On the face of the membership card it stated that Vera was a member because she had been

6

persecuted for political motives and her parents had been imprisoned. In Vera's testimony, however, she stated that the only family member that had been imprisoned was her uncle. When she was confronted by this inconsistency between her testimony and her document, Vera changed her story and claimed that only her father had been imprisoned, but not her mother. Fourth, the Gjolajs proffered statements from their family physician, Zeqir Duka, concerning Vera's alleged rape and Luc's alleged head injury. The statements listed Duka's title as "Legal Physician of Criminal Technique." The IJ stated that Vera "was never able to give the Court any valid or credible explanation as to why her family doctor would also have a dual hat as a criminal technique doctor for the republic of Albania." The IJ noted, moreover, that according to State Department Country Reports, Albanian "medical records proffered in asylum cases in the United States are often forged" and neither Vera nor Luc could demonstrate the validity or chain of custody of the documents. Accordingly, the IJ stated that the supporting documents proffered by the Gjolajs were "very suspicious and should not be given any weight by this Court."

Finally, the IJ found that the Gjolajs' political persecution claim was inconsistent with both past and present country conditions. The IJ stated that the State Department Country Reports for Albania for the years in question reflected that "there have been no major outbreaks of violence since 1998, and all available evidence suggests that neither the government nor the major political parties engaged in policies of abuse or coercion against their political opponents." According to the Country Report issued in 2001, the year the Gjolajs arrived in the United States, it would be "highly unlikely that anyone would have credible claims for political persecution." The IJ also noted, according to the Country Reports for Albania, presently there is "no pattern or fact of persecution of anyone similarly situated to her, that is a common run of the mill member" of the Democratic Party. Thus,

7

the IJ found that the Gjolajs' asylum claim was inconsistent with both past and present conditions in Albania.

In total, the ambiguity and internal inconsistencies of the Gjolajs' testimony as well as the inconsistencies between their testimony, supporting documents, and country conditions constitute substantial evidence such that a reasonable finder of fact could conclude that the Gjolajs were incredible. Furthermore, a reasonable adjudicator could find that the Gjolajs had failed to corroborate their claim as the documents proffered in support were suspicious and unauthenticated. We therefore are not compelled to conclude that the Gjolajs satisfied their asylum burden of establishing past persecution or a well-founded fear of future persecution.

## II. Request for Withholding of Removal

The Gjolajs also petition for review of the administrative denial of their request for withholding of removal. In order to qualify for withholding of removal, an applicant must establish a clear probability that she will be persecuted if forced to return to the country of removal. *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir.2004). An applicant must demonstrate that "it is more likely than not" that she will be persecuted upon return. 8 C.F.R. § 1208.16(b)(2). The IJ found that because the Gjolajs failed to establish eligibility for asylum, they necessarily failed to meet the higher burden for withholding of removal. We are not compelled to reach a contrary conclusion.

## III. Request for Voluntary Departure

The Gjolajs claim that the IJ erred in denying their request for voluntary departure. By statute, however, "[n]o court shall have jurisdiction over an appeal from denial of a request for an order of voluntary departure under [8 U.S.C. § 1229c(b)]." 8 U.S.C. § 1229c(f). Therefore, this Court lacks jurisdiction to review the IJ's denial of voluntary departure.

8

### IV. Request for Relief Under the Convention Against Torture

Finally, the Gjolajs argue that the IJ erred by not considering their application for withholding of removal under the Convention Against Torture. The Gjolajs, however, did not request such relief in their asylum application. The IJ noted this in his decision and further stated that he would have rejected the request even if it had been properly tendered. We find no error.

### V. Conclusion

For the foregoing reasons, we **AFFIRM** the decision of the BIA and **DENY** the petition for review.