**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0508n.06

No. 08-3580

**FILED**
**Jul 22, 2009**
LEONARD GREEN, Clerk

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| FATMIRE KOCIBELLI and | ) | |
| INA KOCIBELLI, | ) | ON REVIEW FROM THE |
| | ) | BOARD OF IMMIGRATION |
| **Petitioner,** | ) | APPEALS |
| | ) | |
| v. | ) | |
| | ) | **O P I N I O N** |
| ERIC H. HOLDER, ATTORNEY | ) | |
| GENERAL, | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

**Before:  MARTIN, SUHRHEINRICH, AND WHITE, Circuit Judges**

WHITE, Circuit Judge.  Petitioner Fatmire Kocibelli and her daughter Ina Kocibelli seek review of the Board of Immigration Appeals' (BIA) final decision denying asylum and withholding of removal under the Immigration and Nationality Act (INA).[1]  We **DENY** Kocibelli's petition for review.

**I.  BACKGROUND**

Fatmire Kocibelli was born in Lezhe, Albania on October 12, 1958.  In 1981, she married Veli Kocibelli, with whom she had two children:  Selda, who was born in 1983, and Ina, who was born in 1988.  In August 1997, the couple separated due to Veli's concerns about Fatmire's political

---

[1]Ina Kocibelli was an unmarried child at the time of Fatmire Kocibelli's first application for asylum and was included in her mother's application.  (Pet'rs' App. at 485.)  8 U.S.C. 1158(b)(3).

activism. Veli took custody of Selda and Fatmire took custody of Ina. The couple did not, however, obtain a legal divorce.

Prior to and after the separation, Kocibelli was involved in pro-democracy activities, eventually joining the Democratic Party of Albania on January 21, 1991. During the decade that followed, she claims to have been involved in Democratic party meetings and demonstrations, most notably speaking at September 1998 and October 1999 Democratic Party demonstrations and serving as a monitor during Albania's October 2000 elections. She further alleges that she was accosted and hauled to the police station on at least two occasions. During this period, Kocibelli also began a relationship with Arbin Kola, a well-known wrestler in Albania who worked as a bodyguard for Socialist Party members. Kocibelli alleges that over time her relationship with Kola grew violent and he began inappropriately touching Ina. According to Kocibelli's testimony, in April 2002, Kola severely beat her and threatened to kill her for speaking out against the Socialist government. Following this incident, Kocibelli made plans to leave Albania.[2]

Kocibelli and her daughter Ina arrived in the United States on or around May 9, 2002. They entered the country at Miami International Airport using fraudulent Greek passports that Kocibelli purchased in Albania. At this time, Kocibelli made a sworn statement to an INS officer. (Pet'rs' App. at 512-16.) During the interview she explained that she was traveling from Albania and seeking asylum because she feared that her boyfriend would kill her and Ina. (*Id.* at 516.) On May 16, 2002, the INS conducted a credible fear interview, during which Kocibelli described herself as

---

[2]Kocibelli did not include all of these incidents in her written submissions and some of them are arguably inconsistent with those submissions. *See* discussion *infra* Section II.

2

"active with the Democratic Party" and expressed her fear of "being attacked and beaten by members of the Socialist-backed government of Albania and her ex-boyfriend, who is also a member of the Socialist Party and the local police." (*Id.* at 497, 501.) She also claimed that her daughter told her that Kola "was trying to touch her breasts" and that following this incident Kocibelli feared her boyfriend. (*Id.* at 502.)

When the asylum officer asked Kocibelli about problems that resulted from her Democratic Party membership, Kocibelli explained that she lost her job at a laboratory;[3] that the police called her "into the office several times," questioned her, and told her "leave here or you will have consequences for the rest of your life"; that she "received many threats"; and that the police pushed her during the 2001 elections. (*Id.* at 502-03.) Beyond these incidents, she claimed "nothing happen[ed]." (*Id.* at 503.)

The INS deemed Kocibelli a removable non-citizen who lacked valid entry documents. In the Miami-based removal proceedings that followed, Kocibelli admitted the allegations in the amended Notices to Appear, conceded removability and, on January 29, 2003, applied for asylum and withholding of removal under the INA and the United Nations Convention Against Torture. (*See* Pet'rs' App. at 484-94.) At some point after arriving in the United States, however, Kocibelli learned that Veli and Selda were living in Michigan and the family reunited. As a result of this

---

[3]At the hearing Kocibelli said that she did not lose her job because of her political beliefs and that she did not remember making this statement to the asylum officer. Moments later, however, she apologized and said "[m]aybe because I was very stressed or maybe I said things that I don't, I am not aware of." (Pet'rs' App. at 173.)

relocation, on October 10, 2003, Kocibelli filed a motion for a change of venue to Detroit. The court

granted the motion on October 14, 2003.[4]

After the court granted the change of venue, Kocibelli submitted a second application for

asylum and withholding of removal on August 24, 2005. (Pet'rs' App. at 448-83.) Like her prior

application, it focused on her political activities and the persecution – in the form of beatings, threats,

and attempted arrests – that she suffered at the hands of the Albanian government. Specifically she

claimed the police beat her during political campaigns and rallies in January 1991 and October 1999.

She also described her abusive relationship with Kola and said that he "attempted to rape" Ina. (*Id.*

at 459.) Kocibelli did not, however, allege that the police ever successfully arrested or detained her

and affirmatively answered "No" to the application question "[h]ave you or your family members

---

[4]According to a supplemental written statement (the second statement) and her testimony on the stand, the move to Michigan "did not provide the safety [Kocibelli and Ina] desired" because Selda's fiance, Ilir Markvukaj, sexually assaulted Ina. Around this time, Selda attempted to end the relationship. Markvukaj reacted with violence, admitting he had raped Ina. He then fled Michigan but continued to harass Selda via phone. When Markvukaj eventually returned to Michigan, the police arrested him for rape.

In the second statement, Kocibelli also related suspicious events that preceded a break-in at Kocibelli's home. During the burglary, the Kocibellis lost money, jewelry, and every document "concerning Ilir." (Pet'rs' App. at 417.) A month later someone broke into Kocibelli's car. According to Kocibelli this scared her family into dropping the case against Markvukaj. In contrast, Kocibelli's daughters testified the case continued and the jury found Markvukaj not guilty. Evidence in the record indicates that he was later convicted in the United Kingdom of human trafficking and profiting from prostitution.

According to her oral testimony at the hearing, Kocibelli also met a woman named Vera Gjetaj at a church in Michigan. Gjetaj told Kocibelli that when she was in Albania, she saw Kola with Markvukaj. At the hearing, Gjetaj testified that when she saw Markvukaj in Albania, he told her he was in prison in the United States for trying to make a whole family disappear. (Pet'rs' App. at 270.)

ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country other than the United States." (*Id.* at 453.)

Kocibelli also wrote about what occurred when she worked as an election monitor for the Democratic Party during the October 2000 election. According to Kocibelli, when she "demanded that the election commission take all the necessary measures not to allow anyone to put in the ballot box fraud ballots," a Socialist voter "pulled me by force out of the voting center, punched me and threatened me to close my mouth or he will disappear my children and me." (Pet'rs' App. at 461.)

The IJ conducted hearings on February 17 and March 3, 2006. During these proceedings Kocibellli reiterated much of the content of her various submission to the Immigration Court, but also added new allegations, such as detentions at the hands of the Albanian police, and a suspicious conversation with a woman named Vera Gjetaj. *See supra* note 4. She also altered prior allegations, sometimes in minor ways (e.g. instead of going to the hospital at 3:00 am, Kocibelli alleged that she returned at 3:00 am) and sometimes in major ways (e.g. Kocibelli altered her story regarding the manner in which she was threatened when she worked as an election monitor in October 2000). Mark Saluku, Vera Gjetaj, Fran Kacaj, and Selda and Ina Kocibelli also testified at the proceedings.

On June 30, 2006 the IJ issued an opinion concluding that Kocibelli and her witnesses had not made a credible showing due to numerous inconsistencies between Kocibelli's written and oral testimony and the testimony of various witnesses. He then denied all forms of relief and ordered Kocibelli removed to Albania. He also concluded that Kocibelli had filed a frivolous application.

5

Kocibelli requested the BIA review the IJ's decision. On April 24, 2008, the BIA held that the IJ "erred in finding that the respondent filed a frivolous asylum application," but upheld the IJ's adverse credibility finding. (Pet'rs' App. at 1-3.) With regard to the latter conclusion, the BIA acknowledged that "not all of the reasons cited by the Immigration Judge in support of his adverse credibility determination go to the heart of the lead respondent's claim," but determined that at least five did. (*Id.* at 2.) Therefore, the BIA concluded there was substantial evidence supporting the IJ's determination "that the lead respondent, and particular witnesses testifying on her behalf, are not credible for the reasons stated" within the IJ's opinion. (*Id.*)

Kocibelli petitioned for review by this court on May 13, 2008.

## II. ANALYSIS

Under 8 U.S.C. § 1252 appellate courts have "jurisdiction to review the BIA's decision affirming the IJ's denial of asylum, withholding of removal, and relief under the Convention Against Torture." *Singh v. Ashcroft*, 398 F.3d 396, 400-01 (6th Cir. 2005). However, when a BIA opinion adopts the IJ's reasoning, this court has also reviewed portions of the IJ's decision directly. *Id*. In removal proceedings, this court reviews legal conclusions de novo and "factual findings under the substantial evidence standard." *Ndrecaj v. Mukasey*, 522 F.3d 667, 672 (6th Cir. 2008) (factual findings); *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006) (legal conclusions). Under the substantial evidence standard, "findings of fact are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004). This means that "the petitioner must show that the evidence presented was so compelling that no reasonable factfinder could fail to find the requisite persecution or fear of persecution." *Ouda v. INS*,

6

324 F.3d 445, 451 (6th Cir. 2003); *see also Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006) ("To reverse the BIA's determination we must find that the evidence 'not only supports a contrary conclusion but indeed *compels* it.'" (quoting *Yu*, 364 F.3d at 702)). An IJ's credibility determination is a factual finding subject to the substantial evidence standard. *Yu*, 364 F.3d at 703 ("Credibility determinations are findings of fact . . .").

Under the INA, "the Attorney General may grant asylum to an alien" if "the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." 8 U.S.C. § 1158(b)(1)(A). Pursuant to 8 U.S.C. § 1101 a refugee is any person outside of his or her country of nationality "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."

The applicant bears the burden of establishing refugee status. 8 U.S.C. § 1158(b)(1)(B)(i). The applicant may be able to meet this burden through his or her own testimony, without corroboration, "but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii); *see also id.* at § 1158(b)(1)(A) (providing that the Attorney General and Secretary of Homeland Security establish procedures and requirements for determining that an alien is a refugee as defined in 8 U.S.C. 1101(a)(42)).

To make such a showing, an applicant for asylum can establish that he or she suffered past persecution in the applicant's country of nationality on account of one of the aforementioned factors,

creating a presumption that the applicant has "a well-founded fear of persecution on the basis of the original claim." 8 C.F.R. §1208.13(b)(1); *see also Namo v. Gonzales*, 401 F.3d 453, 456 (6th Cir. 2005) ("The alien bears the burden of showing a 'clear probability' of such persecution."). However, an asylum officer or IJ may find the presumption insufficient if he or she finds, by a preponderance of the evidence, that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution" or "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . and under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. §1208.13(b)(1)(i).

An applicant can establish a well-founded fear of persecution in the absence of past persecution if: 1) the applicant fears persecution in his or her country of nationality based on one of the aforementioned factors; 2) there is a reasonable possibility that the applicant would suffer such persecution; and 3) the applicant is "unable or unwilling to return to, or avail himself or herself of the protection of, that country because of such fear." *Id.* at § 1208.13(b)(2).

An alien can also request withholding of removal under 8 U.S.C. § 1231(b)(3). According to that sub-section, the Attorney General may not remove an alien to a country if he finds that "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). In withholding of removal proceedings, an alien receives a presumption of future persecution if he or she establishes past persecution. 8 C.F.R. § 1208.16(b)(1)(i). If, however, the applicant does not establish past persecution, the Attorney General must only withhold removal if the applicant

8

establishes "that it is more likely than not that he or she would suffer such harm." *Id.* at §

1208.16(b)(1)(iii) (emphasis added).

In his oral decision, the IJ concluded that Kocibelli was not credible because of numerous

inconsistencies and contradictions in her testimony. (*See* Pet'rs' App. at 48-56.)[5] He also noted that

witnesses who testified on Kocibelli's behalf made statements that were inconsistent with her

testimony, further eroding Kocibelli's credibility. (*Id.* at 56-68.)

The BIA opinion organized these issues into to five discrete factors that "particularly

persuaded" the Board to affirm the IJ's credibility determination:

> (1) an inconsistency between the lead respondent's testimony and her asylum
> application regarding how she was treated by police during an October 1999
> demonstration, i.e., whether the police merely grabbed her arms or beat her (I.J. at 12,
> 21-22; *compare* Tr. at 76 *with* Group Exh. 2, Tab B (Asylum Application Statement)
> at 2); (2) the omission in her asylum application regarding her alleged detentions in
> 1991 and 1998 (I.J. at 21; *see* Group Exh. 2, Tabs A and B). The respondent offered
> an "Albanian version," which allegedly referenced her detentions. However, the
> interpreter at the merits hearing indicated that there was no reference to a detention
> in this document (I.J. at 21; Tr. at 139-144; Exh. 7); (3) an inconsistency between her
> testimony and her asylum application regarding whether her boyfriend attempted to
> rape her daughter, the co-respondent (I.J. at 19; *compare* Tr. at 159-60 *with* Group
> Exh. 2, Tab B at 1); (4) in contrast to her testimony at the merits hearing, during her
> credible fear interview, the respondent indicated that after receiving threatening
> phone calls, "nothing happened to her" related to her Democratic party activity (I.J.
> at 17; Group Exh. 3, Tab D, at 8); and (5) an inconsistency between her testimony
> and her asylum application regarding whether force was used to pull her from the

---

[5]The IJ highlighted inconsistencies that are significant (such as whether Kocibelli was grabbed or beaten at the October 1999 demonstration and the manner in which she was removed and threatened when working as an election monitor in October 2000) and that are minor (Kocibelli's inaccurate characterization of her separation as a divorce, Kocibelli's confusing testimony as to the location of her sister, and the time of night Kocibelli's brother took her to the hospital after Kola beat her). We only review the most significant inconsistencies, which are also the same inconsistences on which the BIA relied when affirming the IJ's adverse credibility determination.

> voting center in October 2000 (I.J. at 13; *compare* Tr. 82-83 *with* Group Exh. 2, Tab
> B at 3).

(Pet'rs' App. at 2.)

When an IJ decides an applicant's testimony "lacks credibility, the IJ must include in his or her decision 'specific reasons' explaining why the IJ reached such a conclusion." *Singh v. Ashcroft*, 398 F.3d 396, 402 (6th Cir. 2005). These reasons, in turn, must relate to "issues that go to the heart of the applicant's claim."[6] *Sylla*, 388 F.3d at 926. Furthermore, "[i]f discrepancies 'cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility.'" *Daneshvar v. Ashcroft*, 355 F.3d 615, 623 n. 7 (6th Cir. 2004) (quoting *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir.2000)).

In this case, some of the "inconsistencies and omissions" found by the IJ were irrelevant as they did not "go to the heart of the applicant's claim." *Sylla*, 388 F.3d at 926; *see also Mece v. Gonzales*, 415 F.3d 562, 572 (6th Cir. 2005) ([A]lleged 'inconsistencies and deficiencies' . . . come nowhere close to supporting the conclusion that the substance of the claim of persecution is false."). For example, the BIA acknowledged that it was "not convinced that inconsistencies regarding the lead respondent's marital status" supported the IJ's adverse credibility determination. (Pet'rs' App. at 2.) Nevertheless, some of the factors highlighted in the BIA's opinion are similar to those that the

---

[6]The REAL ID Act of 2005 (Pub. L 109-13, 119 Stat. 231) amended 8 U.S.C. § 1158(b)(1) to allow the trier of fact to make a credibility determination "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii). This updated standard, however, "only applies to aliens who applied for asylum, withholding of removal, or other relief on or after May 11, 2005, the effective date of this division of the Act." *Amir v. Gonzales*, 467 F.3d 921, 925 n.4 (6th Cir. 2006). Kocibelli filed her first application for asylum and withholding of removal on January 29, 2003.

Sixth Circuit has previously cited in support of adverse credibility determinations. *See, e.g.*, *Kaba v. Mukasey*, 546 F.3d 741, 749-50 (6th Cir. 2008); *Bah*, 462 F.3d at 641; *Berri v. Gonzales*, 468 F.3d 390, 395 (6th Cir. 2006); *Yu*, 364 F.3d at 703-04; *see also Gjolaj v. Keisler*, 252 F. App'x 64, 68 (6th Cir. 2007).

Kocibelli claims that all of the aforementioned inconsistencies and omissions were either minor or non-contradictory. Citing *Hamida v. Gonzales*, 478 F.3d 734 (6th Cir. 2007), she argues that the first and second factors are reminiscent of problems this court has described as "not true inconsistencies or [] so irrelevant" that the court was "left with the impression that the IJ reached for anything he could find." *Id.* at 740. The IJ in *Hamida* based his adverse credibility finding, in part, on "the fact that none of the allegations concerning [petitioner's] alleged imprisonment were listed in his application, despite the fact that the application asked for a detailed description of each instance of mistreatment or threat by others." *Id.* at 738. According to the Sixth Circuit:

> the failure of an applicant to provide an exhaustive list of details in his original asylum application does not amount to an inconsistency warranting an adverse credibility finding, given that "the circumstances surrounding the application process do not often lend themselves to a perfectly complete and comprehensive recitation of an applicant's claim to asylum or withholding."

*Id.* at 739 (quoting *Liti v. Gonzales*, 411 F.3d 631, 638 (6th Cir. 2005)).[7] Other opinions contain similar analyses. *See Liti*, 411 F.3d at 638 ("The absence of specific incidents in the application, however, does not give rise to the inference that the Litis are incredible, but rather reinforces their claim of a long history of political protest which cannot be limited to a few specific incidences");

---

[7]Despite rejecting *some* of the IJ's justifications, the Sixth Circuit ultimately upheld the BIA's adverse credibility determination in *Hamida*. 478 F.3d at 740.

*Mece*, 415 F. 3d at 573 ("In the case at bar, it seems to us, the failure to mention one beating among many is of little consequence."); *Vasha v. Gonzales*, 410 F.3d 863 n.4 (6th Cir. 2005) ("[A]n asylum applicant is not required to provide an exhaustive, detailed list of all incidents of persecution in the asylum application.").

Kocibelli did not merely fail to mention one detention among many others or exclude certain details regarding her mistreatment during her detentions. Rather, in both of Kocibelli's applications (a 2003 form submitted in Miami and a 2005 form submitted in Detroit), she answered the question "Have you or your family members ever been accused, charged, arrested, detained, interrogated, convicted and sentenced or imprisoned in any country other than the United States" by marking the "No" box. She wrote nothing in the space below and did not mention her detentions in any of the statements she submitted to the immigration court.[8] *Cf. Kaba*, 546 F.3d at 749-50 (distinguishing *Liti* because "an application should contain at least some indication of the type of assertions that will be made in support of a claim"); *Bah*, 462 F.3d at 641 (relying, in part, on petitioner's inconsistent testimony regarding arrests, to affirm IJ's credibility determination); *Berri*, 468 F.3d at 395-96 (relying on inconsistencies regarding the number of times petitioner was questioned, arrested, and whether he was beaten, to affirm IJ's credibility determination). Therefore, we find that this inconsistency supports the IJ's adverse credibility finding.

---

[8]When the government's attorney pointed this out at the hearing, Kocibelli claimed that she mentioned her detentions to her attorney and wrote them down in the Albanian-language version of her statement. (Pet'rs' App. at 208.) At her request, the IJ allowed Kocibelli to present the Albanian-language version to the court and instructed her to underline the portions relating her detentions. When the translator read these sections, however, they only described mistreatment that Kocibelli suffered during protests. (Pet'rs' App. at 141-44.)

Kocibelli also cites *Hamida* to challenge specifically the BIA's reliance on "an inconsistency between the lead respondent's testimony and her asylum application regarding how she was treated by police during an October 1999 demonstration." (Pet'rs' App. at 2.) Kocibelli argues that the contradiction between her written statement that police "beat me and other participants" and her oral statement that she was not beaten and "got only pushing" reflects a "translation/semantic problem or difference in perception . . . reminiscent of the Immigration Court's approach in *Hamida*." (Pet'rs' App. at 460, 212-213; Br. of Pet'rs at 24.) Yet beyond stating that "translation errors and semantic difficulties are an indelible aspect of these proceedings," Kocibelli produces no explanation of how such problems led to the change in her story. (Br. of Pet'rs at 24 n. 4.)

An inconsistency in an applicant's descriptions of police treatment presents a relevant and legitimate concern. Prior opinions have reversed BIA holdings on similar inconsistencies not because they were irrelevant or minor, but because the court found that the record did not support their existence. For example, in *Pergega v. Gonzales*, 417 F. 3d 623 (6th Cir. 2005) the applicant recognized the error in his affidavit (allegedly caused by a translation problem) and alerted the IJ to the error before the deportation hearing. *Id.* at 629-30 (disregarding inconsistency as to whether applicant was beaten at police station or only questioned). Because the "correction was accepted, and then ignored by the IJ" it could not support the IJ's adverse credibility determination. *Id.* at 630; *see also Mece*, 415 F. 3d at 572-73 (applicant's general statement that he was beaten and punched while being arrested for participating in a demonstration was not inconsistent with his oral testimony that he was beaten at the police station following the demonstration); *cf. Bah*, 462 F.3d at 641

(upholding IJ's adverse credibility determination based, in part, on inconsistencies in applicant's descriptions of how soldiers dispersed a demonstration). Here, the IJ identified true inconsistencies.

The BIA's third reason for upholding the IJ's finding also concerns an inconsistency between Kocibelli's written and oral testimony. In the first statement that Kocibelli included with her 2005 application, she wrote that her Socialist boyfriend "attempted to rape my daughter." (Pet'rs' App. at 459, 461). At the hearing, however, Kocibelli conceded that Kola's actions only consisted of petting and touching her daughter's chest in a way that made her fear he was "going to do something." (*Id.* at 226.) When asked why her application described these actions as attempted rape, Kocibelli explained: "I had mentioned that he was doing that thing with his hands and that's the way I understand it." (*Id.* at 227.)

We agree with Kocibelli's argument that the events described in her asylum application and verbal testimony "can be reasonably perceived as the beginnings of sexual coercion in the eyes of a mother witnessing her pre-pubescent child being groped by an older man." (Br. of Pet'rs at 28.) The BIA's reliance on this discrepancy – which could be the result of language and cultural barriers – is not convincing. *Hamida*, 478 F.3d at 740 (rejecting IJ's reliance on a discrepancy caused by the applicant's confusion in identifying sexual assault versus sexual harassment). Furthermore, this inconsistency does not "go to the heart" of Kocibelli's claims for asylum, which rely on the persecution she suffered because of her membership in the Albanian Democratic party.

The fourth source of support for the IJ's adverse credibility determination is one of Kocibelli's statements at her credible fear interview. During the interview, the asylum officer queried Kocibelli several times about her Democratic party activity causing "problems." In response

14

she alleged that she lost her job at a laboratory, that the police questioned her several times, that police told her she should not support the Democratic party, that the police told her to "leave here or you will have consequences for the rest of your life," and that she received "many threats." (Pet'rs' App. at 503.)  Yet further inquiry by the asylum officer led Kocibelli to state that "nothing" else happened and that she came to Albania for the safety of her daughter.[9]

Kocibelli argues that "[t]he syntax, grammar, context, and timeframe of the interviewer's question are ambiguous, even to a native English speaker."  (Br. of Pet'rs at 29.)  Furthermore, Kocibelli notes that she "had just finished telling the interviewer, multiple times, that she was (i) threatened with her life, (ii) detained, and (iii) that her daughter, Ina, was molested" and that "[s]everal questions later, Ms. Kocibelli revealed she was also 'pushed' and 'hurt' and 'fear[ed] members of the Socialist Party of Albania.'"  (*Id*.)  At the interview, however, Kocibelli did not discuss any arrests, beatings, or public confrontations with police, despite mentioning that she had participated in "all [the Democratic Party's] meetings and demonstrations."  (Pet'rs' App. at 501.)

---

[9]According to the transcript of the interview, after alleging that she received threats telling her to "leave and not to support the Democratic Party," the asylum officer asked:

Q:  When did you receive your calls?
A:  In 1996, I received the calls.
Q:  Did anything happen related to your Democratic Party activity?
A:  Nothing happen.
Q:  Did anything else happen related to your Democratic Party in Albania after 1996?
A:  No, I came here for the safety of my daughter.

(Pet'rs' App. at 503.)

Nevertheless, the transcript appears incomplete, with follow-up questions indicating Kocibelli's statements contained more information than the transcriber recorded. After explaining that she received "many threats," the asylum officer asks "[w]hen did you receive your *calls*?" (Pet'rs' App. at 503 (emphasis added).) Kocibelli's explanation of what occurred when she confronted Kola about his treatment of Ina is equally disjointed. According to the transcript, Kocibelli said that Kola "hit me and started attacking me." (*Id.* at 502.) Later, in the first reference to meeting Kola for coffee, Kocibelli claims "[h]e said he would kill me on the day I had coffee with him." (*Id.* at 503.) Yet toward the end of the interview, in the only other reference to coffee, the asylum officer asked "[d]id anything else happen after being beaten in the coffee shop?" (*Id.* at 504.) Furthermore, this court has expressed a reluctance to rely on credible fear interviews to uphold adverse credibility findings. *See Toma v. Gonzales*, 189 F. App'x 492, 498 (Martin, J.) (unpublished disposition) ("We are reluctant to sustain an adverse credibility finding on the grounds that an applicant's testimony during a credible fear assessment was not as complete as at the final hearing. Such a requirement, 'not only ignores the reality of the interview process, but would, in effect, create an unprecedented preasylum application process.'" (quoting *Singh v. INS*, 292 F.3d 1017, 1021 (9th Cir.2002))); *cf. Yu*, 364 F.3d at 703 n. 4 (discussing arguments for discrediting the reliability of initial airport interviews). For these reasons, we hold that the credible fear interview does not provide substantial support for the IJ's adverse credibility determination.

The final inconsistency cited by the BIA involved Kocibelli's contradictory explanations of how she was removed from the voting center in October 2000. In the personal statement attached to her 2005 asylum application, Kocibelli explained:

16

> In September 2000 was [sic] the campaign for the local elections and I did campaign for [sic] PD [ Democratic Party] and its candidate for the city's mayor. On Election Day on October 1, 2000 I saw a group of socialist voters who had in their pockets many false ballots and I demanded that the election commission take all of the necessary measures not to allow anyone to put in the ballot box fraud ballots. One of the men of the group pulled me by force out of the voting center, punched me and threatened me to close my mouth or he will disappear my children and me.

(Pet'rs' App. at 460-61.) In contrast, Kocibelli's oral testimony indicated that, after she reported voter fraud, her mother's neighbor came to the polling place and told her that her daughter was sick. He convinced her to leave the polling place to go to her mother's home (where her daughter was presumably staying). The man led her to a car parked outside of the polling station in a "forest area" where "there were two individuals there who were speaking in the (indiscernible) dialect dressed in a suit and they told me shut up and they pointed their gun on my head." (*Id.* at 150, 154.)

When asked about this inconsistency, Kocibelli said that other incidents also occurred that day, including "[t]wo or three times they just tell me chill out. They grabbing [sic] me by my jacket and pushing me down." (Pet'rs' App. at 149; *see also id.* at 215 (replying to why she made a written statement inconsistent with her story on the stand: "Incident happened to[o], while I was going to bathroom. But I was (indiscernible) sat down by force and grabbing [sic] by the hands").) She later explained that she did not mention the fact that men pointed guns at her head in her written statement because, "I knew everything that happened to me and maybe I felt I, there is nothing better, to hide everything that has happened . . . I never thought that I had to write all that things [sic] because I always had, I, I always knew that I was going to be on here forever." (*Id.* at 215.)

Even accepting as true Kocibelli's explanation that more than one incident occurred on October 1, 2000, the IJ was reasonable in finding her inconsistent testimony eroded her credibility.

17

Furthermore, her written testimony that she was physically forced out of the voting center and punched is still inconsistent with her oral statement that – in addition to having a gun pointed at her head – she was grabbed by her jacket and pushed down. Even interpreting Kocibelli's testimony in the best possible light, there are contradictions that support the IJ's adverse credibility finding.

Therefore, despite rejecting some of the reasons for the BIA's affirmation of the IJ's adverse credibility determination, we must conclude that substantial evidence supports the IJ's finding.

## C. Humanitarian Asylum Relief

Kocibelli claims that the IJ and BIA should have considered her request for humanitarian asylum relief under 8 C.F.R. § 1208.13. According to § 1208.13(b)(1)(iii):

> An applicant described in paragraph (b)(1)(i) of this section who is not barred from a grant of asylum under paragraph (c) of this section, may be granted asylum, in the exercise of the decision-maker's discretion, if:
> (A) The applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution; or
> (B) The applicant has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country.

Kocibelli claims that she faces "other serious harm" in Albania. The Justice Department has defined "other serious harm" as "harm that is not inflicted on account of race, religion, nationality, membership in a particular social group, or political opinion, but is so serious that it equals the severity of persecution." 65 Fed. Reg. 76121-01 (2000); *see also Liti*, 411 F.3d at 641.

Subsection 1208.13(b)(1)(i) describes an applicant who has established past persecution but who does not receive asylum because a trier of fact determined that: (A) "[t]here has been a fundamental change in circumstance such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality" or (B) "[t]he applicant could avoid future

18

persecution by relocating to another part of the applicant's country of nationality." 8 C.F.R. §

1208.13(B)(1)(i)(A)-(B). For this reason, the Sixth Circuit has explained that the other serious harm

provision – which only applies to "[a]n applicant described in paragraph (b)(1)(i) of this section" –

"provides a second avenue of relief for victims of past persecution whose fear of future persecution

on account of a protected ground has been rebutted by evidence of changed country conditions or

of safe harbors within his or her home country." *Hamida*, 478 F.3d at 741 (quoting *Liti*, 411 F.3d

at 641-42).[10] The IJ's adverse credibility determination undermines Kocibelli's effort to show past

persecution and renders irrelevant her arguments irrespective of any change in country conditions

or safe harbors. *See, e.g.*, *Gjolaj*, 252 F. App'x at 67 (unpublished disposition) (citing *Sako v.*

*Gonzales*, 434 F.3d 857, 862 (6th Cir. 2006)); *see also Ceraj v. Mukasey*, 511 F.3d 583, 594 (holding

petitioner who failed to meet the standards for asylum eligibility could not meet the higher standards

for withholding of removal). For this reason, we hold that the IJ and BIA did not err in failing to

consider Kocibelli's humanitarian asylum claim.

### III. CONCLUSION

For the aforementioned reasons, the court **DENIES** Kocibelli's petition for review of the

BIA's final order denying her application for asylum and related relief.

---

[10]*See also Sambia v. Mukasey*, 2009 WL 170670, at *8 n.5 (6th Cir. Jan. 26, 2009) (unpublished disposition) ("An applicant who has only suffered past persecution may also qualify for asylum if he establishes that 'there is a reasonable possibility that [he] or she may suffer other serious harm upon removal to that country.'" (quoting 8 C.F.R. § 1208.13(b)(1)(iii)(B))); *Martini v. Mukasey*, 314 F. App'x 819, 826 (6th Cir. 2008) (unpublished disposition) (refusing applicants' request for remand for consideration of humanitarian asylum claim because they had "not presented credible evidence of past persecution or a well-founded fear of persecution"); *Matter of Chen*, 20 I. & N. Dec. 16, 19 (BIA 1989) (applying the regulation in this manner).