RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0093p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RACHED HAMIDA BEN HAMIDA; SONIA HOUCINE
BEN HAMIDA,

*Petitioners,*

*v.*

No. 06-3134

ALBERTO GONZALES, Attorney General,

*Respondent.*

On Appeal from the Board
of Immigration Appeals.
Nos. A78 371 078; A78 371 079.

Argued: February 2, 2007

Decided and Filed: March 7, 2007

Before: MARTIN, COLE, and GILMAN, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Marshal E. Hyman, MARSHAL E. HYMAN & ASSOCIATES, Troy, Michigan, for
Petitioners. John W. Blakeley, UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Respondent. **ON BRIEF:** Marshal E. Hyman, Russell R. Abrutyn, MARSHAL E.
HYMAN & ASSOCIATES, Troy, Michigan, for Petitioners. Sara L. Niles, Mark L. Gross,
UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

**OPINION**

---

BOYCE F. MARTIN, JR., Circuit Judge. Rached Hamida Ben Hamida (Rached) and Sonia
Houcine Ben Hamida (Sonia), husband and wife, appeal the denial of their applications for asylum,
withholding of removal, and protection under the Convention Against Torture. Because the BIA's
adverse credibility finding was supported by substantial evidence, we deny their petition.

I

The Ben Hamidas are natives and citizens of Tunisia, who married there in 1996. They
entered the United States on August 13, 1999, as nonimmigrant visitors for pleasure, with

permission to remain until August 12, 2000.[1]  Since their arrival in the United States, Rached and Sonia have had three children.  (Sonia was pregnant with their third child at the time of their hearing before the IJ.)  On May 9, 2000, while still lawfully in the United States, they applied for asylum with the Immigration and Naturalization Service.

Following a merits hearing on September 8, 2004, the Immigration Judge (IJ) denied their applications for relief and ordered the Ben Hamidas to be removed to Tunisia.  The IJ found that Rached's story (explained in detail below) was inconsistent with his application, corroborative witnesses, and a corroborative document pertaining to his incarceration.  The IJ further found that even if Rached were to be believed, nothing in his story would have risen to the level of past persecution.  On January 10, 2006, the Board of Immigration Appeals (BIA) adopted and affirmed the IJ's decision in a one-page order.  The BIA agreed with the IJ's conclusion that Rached was not credible and his explanations for the inconsistencies in his story were unavailing.  We have jurisdiction to review the BIA's final order of removal pursuant to Section 242 of the Immigration and Nationality Act, 8 U.S.C. § 1252(a)(1).

II

A

The IJ, acting on behalf of the Attorney General, has discretionary authority to grant asylum to those applicants who qualify as "refugees."  8 U.S.C. § 1158(b)(1).  Thus, the determination of whether to grant asylum is broken down into two inquiries: (1) whether the applicant qualifies as a "refugee" under section 1101(a)(42)(A); and (2) "whether the applicant merits a favorable exercise of discretion by the Attorney General."  *Ouda v. INA*, 324 F.3d 445, 451 (6th Cir. 2003) (internal quotation marks and citations omitted).  A refugee is someone unwilling to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A).

We review factual findings, which include adverse credibility findings, under the substantial evidence standard.  *Yu v. Ashcroft*, 364 F.3d 700, 703 & n.2 (6th Cir. 2004).  These findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252(b)(4)(B).  An adverse credibility finding should be based on the heart of an asylum applicant's claim, not "based on an irrelevant inconsistency."  *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004) (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n.2 (6th Cir. 2004)).  Because the BIA issued a brief order which adopted the IJ's findings, we review the IJ's decision directly.  *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005).

B

After a review of each individual basis used to support the IJ's adverse credibility finding, we conclude that while many were irrelevant, or in fact, not even inconsistent, there is sufficient inconsistency in the record to support the IJ's conclusion, especially in light of the extremely deferential standard of review to which we must adhere.  *See Sylla*, 388 F.3d at 925-26 (explaining that under the substantial evidence standard, "[a] reviewing court should not reverse 'simply because it is convinced that it would have decided the case differently'") (quoting *Klawitter v. INS*, 970 F.2d 149, 151-52 (6th Cir. 1992)).

---

[1]Sonia was allowed to enter because she was touring the United States with other students from the University of Tunis.  Rached received permission to accompany her.

i. The IJ's Proper Reliance on Certain Inconsistencies

Rached claims that he was persecuted by the Tunisian government for being a member of the Islamic Orientation Movement, although he denies this affiliation.[2] According to Rached, his problems began in 1987, when the Tunisian police broke into his house while he was studying for his high school final exams. Although his brother Mohamed was arrested, Rached claims that he was somehow able to escape arrest. However, later that year, Rached was arrested when he went to the police station to submit a paper for school, and allegedly remained in jail for two months thereafter. Although Rached's asylum application did not provide details of his detention, in his reply letter[3] to the INS's Intent to Deny letter, and later during his hearing, Rached claimed that while he was imprisoned he was kept in a dirty cell, not provided with enough food, and often not allowed to sleep. Rached also stated that while he was not beaten, the guards threatened to sexually assault him and placed a big dog in his cell at night. Rached contends that for the twelve years between his release from prison and his departure to the United States, he was under constant surveillance, police came to his home multiple times a year, and he was required to report to police on a daily basis.

Rached alleges that after two months in jail, he was released, and that six months after his release, the case against him was dismissed. As proof of his time in jail and subsequent release, Rached provided a translated document from the Ministry of Justice in which Rached was named as "suspect number 31." Joint App'x at 230-232. The IJ took issue with the fact that the translated document does not provide any discussion of suspect number 31's alleged crimes, although the document contains discussion of allegations against other suspects. Further, nothing in the translated document demonstrates that Rached and suspect number 31 are the same person. Ultimately, the IJ concluded that there was no evidence whatsoever that Rached had ever been arrested. While this lack of evidence is not technically an inconsistency, the omission undermines Rached's reliance on the alleged arrest as evidence of persecution.[4]

We also find that Rached's inconsistent statements regarding his education and employment provide adequate grounds upon which to base an adverse credibility finding. The IJ found it unusual—and we agree—that despite his alleged problems with the government, Rached was still able to obtain a high school diploma and undergraduate and master's degrees from the University of Tunis, a free, government-sponsored university. Rached contends that he avoided getting into trouble with the government because his school used a blind grading method. But this does not explain why the government would have allowed Rached to enroll in the school in the first place. The adverse credibility finding is thus supported by the seeming inconsistency of the government

---

[2] One factor that contributed to the IJ's adverse credibility determination was that Rached appeared equivocal as to whether he was a member of the Islamic Orientation Movement. While Rached denies having any affiliation with the Movement, the IJ found that at one point during his hearing, Rached appeared to slip and state that he was in fact part of the group. Rached's personal statement attached to his asylum application also seems to imply that he was involved in the Islamic Orientation Movement.

[3] This letter, dated July 25, 2000, was a response to an "Intent to Deny" letter sent to Rached by the INS on July 11, 2000. The INS's letter was not presented to the IJ and is not in the record.

[4] Although the IJ stated that the original, untranslated "Misdemeanor Judgment" document from the Ministry of Justice was never produced, a document with Arabic writing and containing dates identical to those in the translated "Misdemeanor Judgment" document is in the Joint Appendix. Joint App'x at 233-39. Thus, unless this Arabic document was not originally provided, the IJ appears to have overlooked it.

allowing Rached to complete college and graduate school, and even paying for it, but going out of its way to prevent him from getting a teaching job after graduation.[5]

There is a great deal of confusion regarding Rached's employment in Tunisia. At his hearing, Rached claimed that in 1992 he briefly held a job as a teacher at a government school, but after forty days as a government teacher, the Minister of Education sent him a letter firing him "because of political reason [sic] because [he] was arrested." Joint App'x at 87. In his asylum application, Rached stated that he was unemployed due to the government's accusations that he belonged to the Islamic Movement. The IJ found his statement that he was unemployed to directly contradict the biographical information attached to his application, which provided that he worked as a "private teacher" at a "private school" for four years and two months. In his later testimony at his hearing, Rached attempted to clarify by explaining that because the government barred him from working as a teacher, he was forced to secretly tutor small groups of students.

The IJ found these inconsistencies to be particularly noteworthy because Rached claimed in his personal statement attached to his asylum application that when he went to the Ministry of Interior to ask why he could not get a job teaching, he was told: "[y]ou are an opponent of the government. Therefore, you are deprived of work, *even teaching at private institutions and private lessons*." Joint App'x at 40-41 (quoting Joint App'x at 248) (emphasis added). Yet Rached still was able to earn an income after being fired. Further, at oral argument, the Ben Hamidas' attorney stated that Rached was only prevented from obtaining *government* work. Thus, Rached has been entirely inconsistent in explaining the extent of this alleged teaching ban — an issue we deem central to his claim of persecution.

The strongest basis for the IJ's adverse credibility finding concerns the length of Rached's employment. Rached claimed in his reply to the INS's Intent to Deny letter, and Sonia agreed during the hearing when the letter was read to her, that Rached privately tutored for two years. But as mentioned above, Rached's asylum application stated that he worked as a "private teacher" in a "private school" for *four years and two months*. We have held that an inconsistency concerning a span of time may not be enough to justify an adverse credibility finding. For example, in *Yu*, we characterized an applicant's testimony that he spent ten days in Singapore, Malaysia, and Thailand in order to avoid police, while documents read fifteen days, as a minor inconsistency that taken alone, "would be an inadequate basis for an adverse credibility finding." 364 F.3d at 704. However, there is a big difference between forgetting whether one spent ten or fifteen days avoiding police, and whether one spent two years or over four years at a particular job. When faced with this significant discrepancy, which goes to the heart of Rached's claim that the government deprived him of work, we cannot say that the IJ's adverse credibility finding was in error.

### ii. The IJ's Improper Reliance on Largely Irrelevant Inconsistencies

The IJ took issue with the fact that none of the allegations concerning Rached's alleged imprisonment were listed in his application, despite the fact that the application asked for a detailed description of each instance of mistreatment or threat by others.[6] The IJ also noted that with respect

---

[5]Along a similar line, we note that Rached tried for five years to obtain, and eventually received, a passport to study in France. (By the time he finally received a passport, he did not need it because he had already completed his education in Tunisia.) We find it odd that Tunisian authorities would require Rached to report to officials on a daily basis, yet give him a passport allowing him to study in another country.

[6]The IJ also took issue with the length of time Rached alleged he spent in prison, noting conflict between Rached's assertion that he had been detained for two months, and his earlier statement that he had been detained for "a while." Joint App'x at 39, 114. As the phrase "a while" could mean two months in some contexts, we agree with Rached's counter-argument that the IJ's belief that "a while" must have meant merely a few hours or days is "pure speculation or conjecture on his part." Appellant's Br. at 24; *see Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005)

to the alleged threat of sexual assault, his mother knew nothing about it, and his wife did not know about it until she read Rached's reply letter. However, we have explained that the failure of an applicant to provide an exhaustive list of details in his original asylum application does not amount to an inconsistency warranting an adverse credibility finding, given that "the circumstances surrounding the application process do not often lend themselves to a perfectly complete and comprehensive recitation of an applicant's claim to asylum or withholding." *Liti v. Gonzales*, 411 F.3d 631, 638 (6th Cir. 2005) (quoting *Secaida-Rosales v. INS*, 331 F.3d 297, 308 (2d Cir. 2003)). *Liti* also approved of the Second Circuit's observation that

> the form utilized by the INS for applications for asylum and withholding provides half a page for the applicant to explain why he or she is seeking asylum, and no more than two inches to recount mistreatment or threats against the applicant or the applicant's family by the government or other groups. Although the application invites the applicant to attach additional pages, we think the small space on the form itself would hardly indicate to an applicant that the failure to include every detail regarding the basis for asylum could later lead to an adverse credibility finding when the applicant elaborates on them in the course of a deportation hearing.

*Id*. (quoting *Secaida-Rosales*, 331 F.3d at 308). Therefore, Rached's initial failure to include every detail does not support an adverse credibility finding.

Further, we disagree with the IJ's conclusion that Rached's failure to disclose to his wife and mother the alleged threats of sexual assault support an adverse credibility finding, as an applicant's shame about such events may cause the applicant to withhold details from loved ones. *See Tan v. United States Attorney General*, 446 F.3d 1369, 1372 (11th Cir. 2006) (noting that an applicant claiming to be the victim of a sexual assault did not initially tell her boyfriend about the event until her pastor in the United States convinced her it was not her fault, and did not apply for asylum due to shame until her pastor convinced her to apply); *Fiadjoe v. Attorney General*, 411 F.3d 135, 159-60 (3d Cir. 2005) (rejecting the BIA's adverse credibility finding because, in part, it failed to consider the fact that an asylum applicant did not feel comfortable telling an INS officer about past sexual abuse, despite a statement by the applicant's psychologist that "[g]iven the extreme shame that surrounds [sexual abuse] issues in general they are difficult for both men and women to discuss. With the addition of the cultural factors surrounding [the applicant's] experiences in particular, it should be of no surprise at all that she would be reluctant to discuss these issues with anyone . . . ."). Given the nature of the alleged threat of sexual assault, *see* Joint App'x at 207, it is unsurprising that Rached initially failed to disclose the details to his wife and mother.[7]

Rached also wrote in his reply letter to the INS that one time when police came to his house, they "sexually assaulted" his mother. Yet during her testimony, his mother claimed that they never assaulted her in any way. When examined about this discrepancy, Rached attempted to clarify that his mother was sexually harassed, not assaulted. Joint App'x at 192 ("Forgive me, sir, because I

---

(noting that an adverse credibility finding cannot be based on "speculation and conjecture") (quoting *Shire v. Ashcroft*, 388 F.3d 1288, 1296 (9th Cir. 2004)).

[7]The government claims that Rached was inconsistent by first alleging in his reply letter that he was sodomized, and then testifying at his hearing that he was merely harassed. The IJ found that "at least the impression is that there probably was a homosexual sodomy and it was forced." Joint App'x at 42. However, Rached never wrote in his reply letter that he was sodomized (his actual language was "[t]he prison guards sexually abused me," and he then describes what amounts to a threat of abuse, Joint App'x at 207). Even if we accept that one could have such an "*impression*" from reading it, this does not amount to an *inconsistency*. To be sure, Rached claims he was "sexually abused." However, he may have simply been confused by the difference between "sexual abuse" and "sexual harassment," just as he was confused by the difference between "sexual assault" and "sexual harassment" with respect to police officers' conduct toward his mother (*see infra*).

thought assault is harass. They harass her."). He stated that the police went into her room while she was partially undressed and sleeping and began calling her names. The IJ found Rached's "assault" versus "harassment" justification unavailing. However, we do not find the IJ's reliance on this discrepancy—which was apparently due to a language barrier or translation error—to be convincing.

Rached alleges that Sonia suffered two miscarriages due to the government's actions. The IJ viewed this story with skepticism, noting that Rached's mother and wife claimed the miscarriages occurred in different years. (Sonia claimed they occurred in each of the two years following the year of their marriage, while Rached's mother claimed they occurred during the same year as their marriage and the following year.) In other words, the IJ relied on the fact that Rached's wife stated that she miscarried in 1997 and 1998, while Rached's mother recalled that her daughter-in-law miscarried in 1996 and 1997. We find that an IJ's use of this "inconsistency" to support a finding of adverse credibility nothing short of absurd.

While our analysis reveals, on balance, that the IJ's adverse credibility finding is supported by substantial evidence, we take issue with many of the alleged "inconsistencies" the IJ deemed necessary to rely upon — some of which are not true inconsistencies or are so irrelevant that we are left with the impression that the IJ reached for anything he could find. This does not assist us in our review, and therefore we encourage IJs to concentrate their efforts on relevant and legitimate inconsistencies. *See N'Diam v. Gonzales*, 442 F.3d 494, 501 (6th Cir. 2006) (Martin, J., concurring) ("The least we can ask of the immigration court is to provide a thorough and complete analysis for its determination beyond identifying minor inconsistencies, cultural differences, or language barriers.") (citation omitted).

C

The Ben Hamidas make an alternative claim that the IJ and BIA failed to consider their eligibility for "humanitarian asylum." Under the rule announced in *Matter of Chen*, 20 I. & N. Dec. 16, 19 (BIA 1989), in rare instances, an applicant may be eligible for asylum where he "has suffered under atrocious forms of persecution," even where there is little likelihood of future persecution. *See also Vaduva v. INS*, 131 F.3d 689, 690 (7th Cir. 1997) (explaining that it is a "rare case where past persecution is so severe that it would be inhumane to return the alien to his native country even in the absence of any risk of future persecution."). In 1990 this rule was codified in 8 C.F.R. § 1208.13(b)(1)(iii), which provides:

> An applicant described in paragraph (b)(1)(i) of this section who is not barred from a grant of asylum under paragraph (c) of this section, may be granted asylum, in the exercise of the decision-maker's discretion, if:
> (A) The applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution; or
> (B) The applicant has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country.

The Ben Hamidas claim that they qualify for humanitarian asylum under (B), the "other serious harm" prong. They argue that even if the harm they faced in Tunisia did not qualify as "persecution," it still qualifies as "other serious harm." In other words, any harm suffered need not rise to the level of "persecution." But contrary to their argument, we have explained that the "[other serious harm] provision provides a second avenue of relief for *victims of past persecution* whose fear of future persecution on account of a protected ground has been rebutted by evidence of changed country conditions or of safe harbors within his or her home country." *Liti*, 411 F.3d at 641-42 (emphasis added and citation omitted). The Justice Department has acknowledged that asylum may be appropriate for applicants who were persecuted in the past and risk future persecution on non-statutory grounds. *Id.* at 642. However, as explained above, the Ben Hamidas have failed to offer

credible evidence that they were persecuted in Tunisia.  Therefore, their claim for humanitarian asylum must fail.

### III

An applicant may be granted withholding of removal based on the same five grounds as asylum.  However, the standard for withholding of removal is more stringent.  The applicant must provide evidence showing that there is a "clear probability" that his or her life would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion.  *Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004).  Because of this higher burden of proof, an applicant who fails to meet the statutory eligibility requirements for asylum must necessarily fail to meet the requirements for withholding of removal.  *Allabani v. Gonzales*, 402 F.3d 668, 675 (6th Cir. 2005).

Because we find that the Ben Hamidas have failed to meet the requirements for asylum, their claim for withholding of removal also must fail.  *Id.*

### IV

An applicant seeking relief under the Convention Against Torture (CAT) does not need to show that torture will occur on account of one of the five statutory grounds listed above.  Rather, torture may be based on any reason so long as it is inflicted by, instigated by, or done with the consent or acquiescence of a government official or someone acting in official capacity.  Torture occurs when

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person.

8 C.F.R. § 1208.18(a)(2).  In order to be granted relief, an applicant must show that it is more likely than not that he or she will be tortured upon return to his or her country.  8 C.F.R. § 208.16(c)(2).

Rather than proffering other, non-statutory grounds for relief under CAT, the Ben Hamidas base their CAT claim on the same grounds proffered for their claims for asylum and withholding of removal.  Just as the Ben Hamidas have failed to demonstrate that persecution is more likely than not to occur, likewise, they have offered no evidence demonstrating that torture (based on the same alleged government conduct as their persecution claim) is more likely than not to occur upon their return.  Therefore, their request for relief under CAT fails.  *See Yu*, 364 F.3d at 703 n.3 (citing *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998)).

### V

In sum, there is substantial evidence to support the IJ's adverse credibility finding.  We deny the Ben Hamidas' petition for review.