NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0011n.06

No 09-3051

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

**Jan 06, 2010**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| **RONGFU HUANG**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Petitioner*, | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| v. | ) | |
| | ) | **O P I N I O N** |
| **ERIC H. HOLDER, JR.**, Attorney General | ) | |
| | ) | |
| *Respondent*. | ) | |
| | ) | |

BEFORE:    MARTIN, BOGGS, and COLE, Circuit Judges.

**COLE, Circuit Judge.**  Rongfu Huang petitions for review of a decision by the Board of Immigration Appeals that affirmed an immigration judge's denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture.  Huang sought relief based on his involvement in Zhong Gong, a meditation and exercise group that has been banned in China.  The immigration judge determined that Huang was not credible and that, even accepting his testimony as true, he had not established a well-founded fear of persecution.  The Board of Immigration Appeals upheld the immigration judge's adverse credibility determination without reaching the question of whether Huang had a well-founded fear of persecution.  For the following reasons, we **AFFIRM** the decision of the Board of Immigration Appeals and **DENY** Huang's petition for review.

## I.  BACKGROUND

### A.    Factual Background

Huang is a citizen of China, where he was born in 1964.  According to his sworn affidavit in his asylum application, Huang began to practice Zhong Gong in 1995 after suffering a serious workplace injury.  He subsequently became actively involved in spreading the practice of Zhong Gong and "curing diseases" using different Zhong Gong treatment methods; over time, he attracted "more and more friends and patients."  (Pet'r Aff., Administrative Record ("R.") 746.)  On the evening of February 3, 2000, Huang was at home with several other Zhong Gong practitioners when the police entered and searched his house, seizing his Zhong Gong books and materials.  He was handcuffed, taken to a police station, and locked in a small, overcrowded cell that had no bathroom other than a bucket and had dead mosquitoes and blood on the walls.  On February 4, the police interrogated him, claiming he was "a little key member" in Zhong Gong and demanding that he identify other practitioners.  (*Id.* at 747.)  When he hesitated, the police hit, kicked, and beat him with an electric rod. On February 5, the police again interrogated him, but Huang refused to disclose any information and asked what was wrong with practicing Zhong Gong.  The police proceeded to beat him again several times that day.  According to his affidavit, Huang was released from custody twenty-eight days later, after his wife paid a sum of money to the police.  After his release, the police forbade the manager at the hotel where he had worked to rehire him, frequently came to his house to threaten him, and stopped individuals with whom he had contact for questioning.  Because of this harassment, Huang decided to flee China, prompting the police to question his family at least once about his whereabouts.

**B.     Procedural History**

1.     *Entry and pre-hearing proceedings*

Huang was admitted to the United States on May 22, 2001, on a non-immigrant visitor's visa that expired on November 21, 2001.  In March 2002, he filed an application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").  On May 16, 2002, he was interviewed by an asylum officer, who referred his application to the Los Angeles Immigration Court.  On May 30, 2002, the then-Immigration and Naturalization Service ("INS"), now part of the United States Department of Homeland Security ("DHS"), served him with a Notice to Appear, charging removability pursuant to the Immigration and Nationality Act ("INA").  On October 4, 2002, when Huang failed to appear for a hearing, a Los Angeles immigration judge ordered his removal to China.  On or about June 25, 2003, Huang was arrested and detained based on the order of removal.  He successfully moved to reopen his removal proceeding, on the grounds that he did not receive the Notice, and to change venue to the Immigration Court in Detroit, Michigan.  At a scheduling hearing on December 3, 2004, he conceded removability but renewed his application for asylum, withholding of removal, and CAT relief.

2.     *IJ hearing*

Huang's merits hearing was held on June 8, 2007.   He was the only witness.  Testifying through an interpreter, he affirmed on direct examination that he had been a member of Zhong Gong since 1995, that the Chinese police had arrested him on the night of February 3, 2000, and that he had been taken into custody for twenty-eight days, during which time he was interrogated and beaten.  According to his testimony, the police beat Huang "many times" with their fists, feet, and "electric

wooden sticks." (Hr'g Tr., R. 222-23.) At some point, Huang passed out, but the police revived him with cold water and continued beating him. Asked by the IJ the number of times he was hit after being revived, Huang stated, "I was hit many times. I couldn't recall. I just . . . let them hit me." (*Id.* at 222.) Asked if he was interrogated or beaten after February 5, Huang replied that he was not. Huang further testified that he was released once his father paid the police 23,000 renminbi (RMB), for which his father received a receipt for only RMB 3000. After Huang left China, the police persisted in harassing his family; the badgering was so severe that it eventually led to Huang's divorce.

At several points during his direct testimony, Huang was asked what the practice of Zhong Gong entailed; each time, he responded by demonstrating a circular hand movement that he claimed was a Zhong Gong exercise. On cross-examination, the DHS attorney asked Huang a series of additional questions about Zhong Gong. Huang identified the founder of Zhong Gong, whom he explained was living in Washington D.C., having previously been granted asylum. Huang was not aware that the founder had died in a car accident the year before. Asked whether he performed exercises aside from the circular hand motion, Huang stood up and again demonstrated a circular movement with his hands, this time apparently with his arms in a different position. The DHS attorney asked if Huang also spoke or performed breathing exercises while practicing Zhong Gong; Huang replied in the affirmative. Asked what he was trying to achieve by practicing Zhong Gong, Huang stated that it helped put his body into "the right position." (*Id.* at 252-53.) Asked whether Zhong Gong had any principles, Huang identified two—"Bader" and "Banian"—and explained, via the use of a poem, that they meant "don't fight with somebody else, don't drink alcohol, and don't

argue with somebody else." (*Id.* at 256-58.)  The DHS attorney concluded the line of questioning

by inquiring whether there were different levels of development in Zhong Gong.  Huang made a

statement that the interpreter had difficulty understanding—"something big cycle and some small

cycle"—before explaining that there were five or six levels through which a practitioner could

advance by improving his practice of Zhong Gong.  (*Id.* at 258-59.)

The DHS attorney then asked Huang to confirm that he had been beaten several times while

in police custody.  Huang replied, "Yes.  That they just continued to torture—to, to beat me every

day." (*Id.* at 261.)  When the IJ interjected strongly that this testimony contradicted Huang's earlier

statement that he had been beaten only on February 4 and 5, Huang repeated that he was beaten

continually after February 5, but that the subsequent beating was only on his feet.  The IJ then asked

Huang a series of questions about the RMB 23,000 paid to the police.  Huang explained that his

father paid the fine, while his (then) wife waited outside the police station.  The IJ asked Huang to

explain why a letter from his (now) ex-wife included with his application stated that she had paid

the police, who had refused to give her a receipt and threatened her not to tell anyone about the bribe.

Huang responded that his father paid the money but did not tell Huang's ex-wife about the bribe.

Pressed by the IJ on why his ex-wife's letter indicated that she paid the fine, Huang responded that

perhaps his father and ex-wife had agreed to spare him the details of what had occurred.  Asked how

he had obtained the receipt that was included with his application, Huang stated that his ex-wife had

mailed it to him from China.  When reminded by the IJ that the police purportedly had refused to

give her a copy of the record, Huang stated that his father had mailed it and his wife "had prepared

the document." (*Id.* at 274.)  Finally, the IJ noted that Huang had testified to not saying anything to

his interrogators, but that his declaration stated he had asked what was wrong with practicing Zhong Gong. In response, Huang affirmed that he had told the police there was nothing wrong with practicing Zhong Gong.

3.    *IJ decision*

In an oral decision delivered on August 27, 2007, the IJ concluded that Huang was not credible. According to the IJ, the most glaring inconsistencies in the application were those regarding Huang's detention and physical mistreatment, which we enumerate here for ease of reference:

> 1. Huang's application states that he was practicing Zhong Gong at home with several friends on the night of his arrest, but he testified that his son and father also were home when he was arrested.
>
> 2. Huang testified that his ex-wife was next door at a wedding and rushed home upon learning that the arrest was taking place, but his ex-wife's letter does not mention these details.
>
> 3. Huang's declaration describes a cell that was so small and overcrowded that people could not lie down, with no bathroom except for a bucket and dead mosquitoes and blood on the walls, but he failed to mention these details at the hearing "when specifically asked if there was any other manner in which he was mistreated or abused." (IJ Decision & Order, R. 130.)
>
> 4. Huang testified on direct examination that he was not beaten after February 5, 2000. On cross-examination, however, Huang stated that he was beaten every day of his detention.
>
> 5. Huang "failed to recall how many times he was beaten and only stated vaguely that he was beaten 'many times.'" (*Id.* at 130-31.)
>
> 6. Huang's declaration states that he was beaten with an electric rod, but he testified only that he was beaten with a stick and fists.
>
> 7. Huang's application states that he spoke with the officers during his interrogation, asking them what was wrong with practicing Zhong Gong and helping others, but he testified "that he did not make any statements to the officers." (*Id.* at 131.)

8. The letter from Huang's ex-wife stating that she was unable to obtain a receipt when she paid the fine, Huang's story about how his father obtained the receipt and agreed with Huang's ex-wife not to tell Huang about the record or the bribe, and Huang's story that his father paid the fine but did not tell Huang's ex-wife "are not only completely inconsistent, but entirely devoid of any explanation how [Huang] actually received the receipt." (*Id.* at 132.)

9. Although Huang testified that the police monitored his neighborhood and questioned his family as to his whereabouts after he fled China, his written application "mentions nothing" regarding this questioning; "[i]t certainly does not mention that the questioning of his ex-wife was so severe that it eventually ruined their marriage." (*Id.*)

10. Huang "testified inconsistently with country conditions at the time he was detained." (*Id.* at 133.) While the 2000 State Department Country Report for China (of which the IJ took administrative notice) states that Zhong Gong was banned in 1999, it does not mention detention or abuse of Zhong Gong practitioners, only that a few of the group's leaders were arrested and charged. Nor did the supporting documents Huang submitted mention instances of arbitrary detention of Zhong Gong practitioners.

The IJ also noted that Huang's testimony regarding his membership in Zhong Gong was

"vague," (*id.* at 126), and identified additional purported inconsistencies:

11. While Huang claimed to have been a practitioner and teacher of Zhong Gong since 1995 and had submitted letters from friends, family, and students attesting to his practice of Zhong Gong, "he was only able to provide basic, general, rudimentary information regarding the discipline of Zhong Gong." (*Id.* at 126-27.)

12. While his application identifies different Zhong Gong practice methods, "[w]hen asked . . . what the practice of Zhong Gong encompassed, [Huang] was unable to do so and simply attempted to demonstrate one exercise" and "stated vaguely" that it involved some breathing techniques. (*Id.* at 127-28.)

13. Huang's application explains that Zhong Gong helps individuals with medical problems and encourages practitioners to help humankind, but at the hearing Huang "had difficulty clearly explaining what it is that the practice of Zhong Gong achieves." (*Id.* at 128.)

14. Huang stated vaguely that there were approximately five or six different levels of mastery in Zhong Gong, "but was not able to explain which level he had obtained," "what each level signified," or "how one advances in the levels," despite stating in his application that curing others' diseases helps one advance. (*Id.*)

15. Huang testified regarding two principles of Zhong Gong, "but when asked to explain one of the principles in more detail, he was unable to do so." (*Id.* at 128-29.)

16. "[Huang] was unaware that the Zhong Gong founder, who he claimed had been granted asylum in the United States, had been killed in an automobile accident well before [Huang's] hearing." (*Id.* at 129.)

The IJ acknowledged that an individual's knowledge of his discipline or religion "is not necessarily dispositive on a credibility issue," but that for Huang, "who allegedly practiced Zhong Gong for more than 11 years and allegedly instructs others in its practice, [being] unaware of certain basic readily available facts (including the death of the founder of Zhong Gong)" undercut his credibility. (*Id.* at 127-29.)

The IJ concluded that, because Huang failed to present credible testimony, he had not established that he was a practitioner or instructor of Zhong Gong, nor that he had been targeted and persecuted by the police, nor that he would be persecuted if he returned to China. Therefore, he had failed to demonstrate his eligibility for asylum, withholding of removal, and CAT relief. Even were she to find Huang's detention story credible, the IJ stated, the presumption that his past persecution created a well-founded fear of future persecution was rebutted by a preponderance of the evidence.

4.      *BIA opinion*

On December 19, 2008, the Board of Immigration Appeals ("BIA"), reviewing the IJ's decision for clear error, dismissed Huang's appeal. The BIA found that the IJ's adverse credibility determination was based upon "valid and material inconsistencies and omissions" that went to the heart of Huang's claim. (BIA Decision, R. 2.) In the BIA's words, "[i]t is central to [Huang's] claim whether he was physically mistreated for 1 or 2 days in detention as opposed to all 28 days of his

detention, whether he spoke with officers during his interrogation as he claimed in his asylum application, and whether he is capable of demonstrating the same level of knowledge about Zhong Gong at his hearing as he purported to possess in his asylum application." (*Id.* at 3.) Because the BIA affirmed the IJ's adverse credibility finding, it did not address the IJ's alternative conclusion that, even were he found credible, Huang had not established a well-founded fear of persecution.

Huang filed a timely notice of appeal on January 16, 2009. We have jurisdiction to review the BIA's final order of removal. *See* 8 U.S.C. § 1252(a)(1).

### III. DISCUSSION

**A. Standard of review**

Huang argues that the IJ's adverse credibility determination, as adopted by the BIA, is not supported by substantial evidence. In reviewing an asylum determination where the BIA adopts portions of the IJ's reasoning and supplements the IJ's opinion, we review the IJ's opinion as supplemented by the BIA's analysis. *See Zhao v. Holder*, 569 F.3d 238, 246 (6th Cir. 2009). We review legal conclusions de novo, but defer to the BIA's reasonable interpretations of the INA. *Id.* at 247 (citing *Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008)). We review factual findings under a "substantial evidence" standard: in other words, we uphold such findings if supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (internal quotation marks and citation omitted). "Under this deferential standard, the court may not reverse the Board's determination simply because we would have decided the matter differently." *Koulibaly*, 541 F.3d at 619 (internal quotation marks and citation omitted). Rather, findings of fact are conclusive "[u]nless 'any reasonable adjudicator would be compelled to conclude to the contrary.'"

*Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)). Facts relevant to credibility determinations are reviewed under the same deferential standard. *Id.* (citing *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004)).

An alien may be granted asylum if he demonstrates that he is a "refugee," 8 U.S.C. § 1158, which the INA defines as an alien who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42). A well-founded fear of future persecution can be based either on a likelihood of harm specifically targeted at the applicant or a pattern or practice of harm to others similarly situated, *see Sempagala v. Holder*, 318 F. App'x 418, 421 (6th Cir. 2009) (citing 8 C.F.R. § 1208.13(b)(2)(iii)), and past persecution gives rise to a rebuttable presumption that the applicant has a well-founded fear of future persecution, 8 C.F.R. § 1208.13(b)(1). An applicant may have a well-founded fear even if there is less than a fifty percent chance of future persecution taking place. *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005).

To qualify for withholding of removal or relief under the CAT, an alien must meet a higher burden of proof. Under 8 U.S.C. § 1231(b)(3), an applicant must be granted withholding of removal if he demonstrates "a clear probability of persecution" by presenting evidence that shows "it is more likely than not that [he] would be subject to persecution" should he return to his native country. *See Dashi v. Gonzales*, 214 F. App'x 581, 584 (6th Cir. 2007) (citing *INS v. Stevic*, 467 U.S. 407, 424 (1984)). As with asylum, to qualify for withholding the applicant must demonstrate that the likelihood of persecution is based on his "race, religion, nationality, membership in a particular social group, or political opinion." *See* 8 U.S.C. § 1231(b)(3). Because the withholding standard

is higher than that for asylum, if an applicant does not meet the burden of proof for asylum, he necessarily fails to satisfy the standard for withholding. *Dashi*, 214 F. App'x at 584 (citing *Yu v. Ashcroft*, 364 F.3d 700, 703 n.3 (6th Cir. 2004)). Similarly, to qualify for CAT relief, the alien must meet the high burden of establishing that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). Unlike for asylum and withholding, however, the applicant need not demonstrate the torture will occur on account of his race, religion, nationality, membership in a particular social group, or political opinion. *See Ben Hamida v. Gonzales*, 478 F. 3d 734, 741 (6th Cir. 2007).

**B.      Adverse credibility determination**

Because Huang filed his application before May 11, 2005, the legal standard in effect prior to the REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231 (codified in scattered sections of 8 U.S.C.), governs the IJ's adverse credibility determination. *See Amir v. Gonzales*, 467 F.3d 921, 925 n.4 (6th Cir. 2006). Under the pre-REAL ID standard, "'an adverse credibility finding . . . must be supported by specific reasons [and] must be based on issues that go to the heart of the applicant's claim.'" *Liti*, 411 F.3d at 637 (quoting *Sylla*, 388 F.3d at 926). An adverse credibility determination cannot be based on an irrelevant inconsistency; rather, only inconsistencies that can be viewed as attempts to enhance the applicant's claim of persecution bear on credibility. *Sylla*, 388 F.3d at 925-26. "Speculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence." *Liti*, 411 F.3d at 637 (internal quotation marks and citation omitted). Nonetheless, "[s]o long as one of the identified grounds [for the adverse credibility finding] is supported by substantial evidence and goes to the heart of [the] claim of persecution," the

court must accept the IJ's determination. *Lin v. Holder*, 320 F. App'x 428, 432 (6th Cir. 2009) (internal quotation marks and citation omitted) (second alteration in original).

An adverse credibility determination does not necessarily bar an applicant's claim, but being found incredible makes it extremely difficult for the applicant to prove his eligibility for asylum, withholding, or CAT relief. *See Vuktilaj v. Mukasey*, 277 F. App'x 545, 549 (6th Cir. 2008) ("While an adverse credibility finding alone will not defeat a claim for asylum, it will undermine a claimant's efforts to meet his burden of proof . . . ."). That being said, an adverse credibility determination may undermine only some facets of the applicant's claim. For example, if the fact-finder determines that the applicant's testimony regarding past persecution is not credible, the applicant nonetheless may demonstrate a well-founded fear of future persecution based on other grounds. *See Lin*, 320 F. App'x at 434 ("'[A]n applicant may prevail on a theory of future persecution . . . so long as the factual predicate of the applicant's claim of future persecution is independent of the testimony that the IJ found not to be credible.'") (quoting *Paul v. Gonzales*, 444 F.3d 148, 154 (2d Cir. 2006)). By contrast, an adverse credibility determination regarding the applicant's religion, membership in a particular social group, or one of the other INA categories, *see* 8 U.S.C. §§ 1101(a)(42), 1231(b)(3), will undermine the applicant's asylum and withholding claims in their entirety, as relief under the INA is available only if the likelihood of persecution is based on one of these grounds. To the extent that the applicant's claim for CAT relief rests on a likelihood of torture due to one of these grounds (as it does here), an adverse credibility determination on this score will undermine the CAT claim as well.

The inconsistencies identified by the IJ in this case may be categorized generally as (i) those purportedly undermining Huang's claim of past persecution (Inconsistencies Nos. 1-10), and (ii) those purportedly undermining his claim of being a Zhong Gong member (Inconsistencies Nos. 11-16).

1. *Inconsistencies undermining Huang's claim of past persecution*

The IJ noted many purported inconsistencies regarding Huang's arrest, custody, and experience after being released. Neither of the two inconsistencies regarding Huang's arrest should have been relied upon by the IJ. The IJ noted that, while Huang's application stated he was at home with several friends on the night of his arrest, he testified that his son and father also were present (Inconsistency No. 1). This court exercises care in evaluating omissions from asylum applications, in recognition that aliens should not be expected to include a comprehensive recitation of their claims. *See Liti*, 411 F.3d at 637. While omissions may form the basis of an adverse credibility determination if they are substantially related to the asylum claim, *see id.*, this omission is too minor to implicate Huang's credibility. *Cf. Ben Hamida*, 478 F.3d at 739 ("[T]he failure of an applicant to provide an exhaustive list of details in his original asylum application does not amount to an inconsistency warranting an adverse credibility finding . . . ."). The inconsistency between Huang's testimony regarding his ex-wife rushing home and the omission of this detail from his ex-wife's letter (Inconsistency No. 2) is equally minor, and it cannot be viewed as an attempt to enhance Huang's claim. *See Sylla*, 388 F.3d at 925-26 (only inconsistencies that can be viewed as attempts to enhance the applicant's claim of persecution bear on credibility).

Most of the purported inconsistencies regarding Huang's custody also do not pass muster. While the IJ stated that Huang failed to describe his cell conditions when asked about his mistreatment and abuse (Inconsistency No. 3), Huang was never asked directly about the state of his cell, and it was unreasonable to expect questions about mistreatment and abuse necessarily to have elicited this information. Huang's failure to recall the number of times he was beaten (Inconsistency No. 5) seems eminently credible in light of his testimony that he was beaten repeatedly, and given the long passage of time between his imprisonment and his hearing. The IJ noted that Huang had not testified to being beaten with an electric rod (Inconsistency No. 6), but this is plainly incorrect: Huang testified that the police beat him with their fists, their legs, and "electric wooden sticks." (Hr'g Tr., R. 222-23.) And while the IJ relied on the purported inconsistency between Huang's testimony that he did not make any statements to the police and Huang's recollection in his affidavit that he had asked them what was wrong with practicing Zhong Gong (Inconsistency No. 7), the record suggests that Huang simply testified to refusing to answer the questions posed by the police during the interrogation.

The IJ also relied on the purported inconsistency between Huang's testimony that the police questioned his family regarding his whereabouts after he left China and the fact that his written application "mentions nothing" regarding this questioning, nor that it led to his divorce (Inconsistency No. 9). Again, we exercise care in evaluating omissions from asylum applications and do not expect applicants to provide an exhaustive list of details in their applications. *See Ben Hamida*, 478 F.3d at 739; *Liti*, 411 F.3d at 637. Huang's application clearly states that the police questioned his family; moreover, Huang was not yet divorced at the time he filed his application.

Finally, the IJ erred in concluding that Huang "testified inconsistently with country conditions at the time he was detained" because neither the 2000 State Department Country Report (of which the IJ took administrative notice) nor the supporting documents in Huang's application specifically addresses the presence or absence of detention or abuse of Zhong Gong practitioners (IJ Decision & Order, R. 133) (Inconsistency No. 10). Labeling a lack of corroborating evidence as an inconsistency for the purposes of making an adverse credibility determination is manifestly incorrect.

Notwithstanding our finding that a reasonable adjudicator would be compelled to conclude that a significant majority of the purported inconsistencies identified by the IJ do not support an adverse credibility determination regarding Huang's claim of past persecution, there remain two inconsistencies (Nos. 4 & 8) that provide substantial evidence for the IJ's assessment. As the IJ noted, Huang testified on direct examination that he was not beaten after February 5, 2000; on cross-examination, however, he testified that he was beaten every day. The IJ gave Huang several opportunities to explain this inconsistency, but his explanation—that he was beaten after February 5 only on his feet—is not credible in light of his earlier testimony. *Cf. Bzhetaj v. Gonzales*, 142 F. App'x 913, 916 (6th Cir. 2005) (upholding adverse credibility finding where petitioners "change[d] and embellish[ed] [their] version of events); *Jelkovski v. INS*, 103 F. App'x 578, 580 (6th Cir. 2004) (upholding adverse credibility determination where petitioner "changed his story on cross-examination"). Similarly, the IJ was correct in concluding that Huang's varying explanations of how he obtained a receipt for the payment to the police, the only objective documentary evidence available that corroborated his story, and whether it originally was given to his father or his ex-wife, are "highly suspect" and "completely inconsistent" with each other. (IJ Decision & Order, R. 131-

32.) Huang's brief before this court attempts to make sense of these inconsistencies by arguing that Huang's ex-wife never claimed that she had personally handed over the money. This explanation, however, contradicts her assertion that she asked for the police record, was refused, and was threatened by the police. As both inconsistencies go to the heart of Huang's claim of past persecution, they are sufficient to support the IJ's adverse credibility finding. Huang was thereby not entitled to a presumptive well-founded fear of future persecution based on the alleged incident of past persecution.

2. *Inconsistencies going to Huang's membership in Zhong Gong*

This leaves Huang's claim of having a well-founded fear based on his membership in Zhong Gong. Many of the purported inconsistencies identified by the IJ as undermining this claim are not supported by the record or were not properly relied upon by the IJ. While the IJ stated that Huang was not able to explain which Zhong Gong level he had attained, what each level signifies, or how one advances to the next level (Inconsistency No. 14), Huang was not asked about any of these subjects, nor was he asked any questions that reasonably could be expected to have elicited such information. While the IJ stated that Huang was unable to explain the Zhong Gong principles that he had identified (Inconsistency No. 15), the record indicates that Huang did elaborate on at least one of these principles. And, while the IJ found that Huang's credibility was undercut by his lack of awareness of the death of Zhong Gong's founder (Inconsistency No. 16), it is not evident why even a long-time Zhong Gong practitioner should have been expected to be aware of this fact. *Cf. Liti*, 411 F.3d at 637 (noting that speculation and conjecture cannot form the basis of an adverse credibility finding).

Nonetheless, the remaining inconsistencies (Nos. 11-13) identified by the IJ provide substantial evidence to support her adverse credibility determination regarding Huang's claim of Zhong Gong membership. These inconsistencies all center on the discrepancy between the limited understanding of Zhong Gong exercises that Huang displayed at his hearing and the level of knowledge he might be expected to have given his claim to be a long-term Zhong Gong practitioner and teacher. *Cf. Iao v. Gonzales*, 400 F.3d 530, 533 (7th Cir. 2005) (noting that "what is central" to Falun Gong," a similar meditation and exercise group, "is the exercises"). Huang apparently demonstrated some knowledge of Zhong Gong exercises and submitted several letters, the legitimacy of which was not challenged, supporting his claim. Nonetheless, a reasonable adjudicator would not be compelled to find Huang's claim credible in light of the discrepancy between the level of knowledge that he demonstrated and that which he might be expected to have. Given multiple opportunities to identify Zhong Gong practices, Huang could demonstrate only one or perhaps two exercises, and he offered only a vague answer regarding what the exercises are intended to accomplish. The level of knowledge that he demonstrated at the hearing seems much lower than one reasonably might expect of an individual who purported to have practiced Zhong Gong regularly for over a decade and submitted letters from friends stating that they had learned Zhong Gong exercises from him. *Cf. Rizal v. Gonzales*, 442 F.3d 84, 90 (2d Cir. 2006) (holding that an adverse credibility finding reasonably may be based on lack of doctrinal knowledge where "the nature of an individual applicant's account would render his lack of a certain degree of doctrinal knowledge suspect . . . for instance, where an applicant claims to have been a teacher of, or expert in, the religion in question").

- 17 -

Before this court, Huang argues that his hearing was marred by the interpreter's difficulties in translating his statements regarding the practice of Zhong Gong. While the IJ took considerable time at the start of the hearing to ensure the adequacy of the interpreter, and while both sides initially confirmed their satisfaction with these efforts, the record does suggest that the interpreter had difficulty understanding Huang. Huang's apparently thick accent and stutter forced the interpreter to ask continuously that Huang repeat his testimony, including Huang's description on cross-examination of the practice and principles of Zhong Gong. However, there is no indication in the record that any mistranslation occurred, and neither side made any such complaint during the hearing. Nor does Huang's brief before this court allege any specific instances of mistranslation. Thus, while we are cognizant that translation issues may bedevil immigration hearings, *cf. Iao*, 400 F.3d at 533-34 (noting "disturbing" insensitivity on the part of immigration adjudicators to possible misunderstandings caused by translation of difficult languages like Chinese), the record does not support a finding that Huang failed to receive a fair hearing. To the contrary, Huang simply did not demonstrate the level of knowledge that one reasonably might expect of an allegedly long-term Zhong Gong practitioner and teacher. Thus, substantial evidence supported the IJ's determination that Huang's claim of being a Zhong Gong member was not credible. The adverse credibility determination on this score necessarily undermines Huang's claims for asylum, withholding of removal, and CAT relief.

## V. CONCLUSION

For the reasons above, we **AFFIRM** the BIA's decision and **DENY** Huang's petition for review.